**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JONATHAN MARCUS, AS TRUSTEE OF THE GRACE PREFERRED LITIGATION TRUST, LLOYD I. MILLER TRUST A-4, MILFAM II L.P., LENADO PARTNERS, SERIES A OF LENADO CAPITAL PARTNERS, L.P., LENADO DP, SERIES A OF LENADO DP, L.P., SPV UNO, LLC, NIKOS HECHT, INDIVIDUALLY, THE HECHT CHILDREN'S TRUST II, BROADBILL PARTNERS, LP, BROADBILL PARTNERS II, LP, COSTA BRAVA PARTNERSHIP III LP, AND KURT LAGESCHULTE, IRRA<br><br>Plaintiffs,<br><br>v.<br><br>W2007 GRACE ACQUISITION I, INC., PFD HOLDINGS, LLC, GOLDMAN SACHS REALTY MANAGEMENT, L.P. F/K/A ARCHON GROUP, L.P., TODD P. GIANNOBLE, BRIAN T. NORDAHL, GREGORY M. FAY, DANIEL E. SMITH, AND MARK RICKETTS,<br><br>Defendants | § | Case No. <u>15-6242</u><br><br>**<u>COMPLAINT</u>** |

The above-named plaintiffs, for their Complaint, allege as follows:

## <u>OVERVIEW OF THE CASE</u>

1. This is a case of shareholder oppression whereby affiliates of Goldman Sachs Group, Inc. (collectively, "**<u>Goldman</u>**") orchestrated a nearly decade-long scheme to defraud the preferred shareholders of the publicly-traded Equity Inns, LLC. Equity Inns, LLC was a real estate investment trust ("**<u>REIT</u>**") with over 137 franchised hotel assets, which was publicly traded on the New York Stock Exchange.

2. In 2007, Goldman, via its wholly-owned subsidiary, Whitehall, merged Equity Inns, LLC into W2007 Grace Acquisition I, Inc. ("**Grace**"). Over the preferred shareholders' protests, Goldman stopped making public filings, ceased disclosures to the preferred shareholders, and de-registered as a REIT. Rather than take the company fully private via a proper tender offer of the preferred shares, Goldman put in motion a series of secretive transactions aimed at oppressing the preferred shareholders to its benefit.

3. In April of this year, the Securities Exchange Commission ("**SEC**") determined that Grace had illegally miscounted the number of its preferred shareholders to avoid the public-filing requirement. The SEC ordered Grace to produce Forms 10-K for the years of 2013 and 2014. Following the SEC's order, Grace disclosed material information that it was legally required to disclose and which should have been public at all relevant times. These disclosures shed light on Goldman's actions, revealing details of self-dealing transactions and agreements between Grace and other Goldman-controlled or owned entities ("**GS Affiliates**"). Through a complex series of transactions, Goldman sought to siphon all of the value out of Grace, divert funds to itself that should have been paid as dividends to its preferred shareholders, and suppress the market and value of the preferred shares to later force those preferred shareholders to sell back their shares to Goldman.

4. First, Goldman knew that Grace had more than 300 preferred shareholders, but manipulated the number of shareholders to justify taking Grace "dark"[1] and to avoid its disclosure and reporting obligations.

5. Next, Goldman caused Grace to enter into a series of sweetheart deals with GS Affiliates, which restructured Grace's equity and debt in a way that benefitted GS Affiliates at

[1] The term "dark" is an industry term used to describe when a company ceases to file financial disclosures with the SEC, and takes other steps to withhold company information from its shareholders and the investing public.

the expense of preferred shareholders. In so doing, Goldman diverted Grace's preferred shareholder dividends to itself.

6. Finally, Goldman formed a shell acquisition company, PFD Holdings, LLC (**"PFD"**), to purchase a 59% majority interest of Grace's preferred shares at severely depressed prices. This allowed Grace to avoid paying preferred shareholders their contractual liquidation preference when Grace ultimately sold substantially all of its hotel assets earlier this year.

7. Defendants' plan was successful. As a result of Goldman's oppressive acts, Plaintiffs, among others, were forced to sell their shares to PFD. However, when Plaintiffs sold their shares to PFD, PFD agreed that an additional purchase price would be paid upon certain conditions should any subsequent transactions occur. At the time of the sale, Defendants failed to disclose that they were in fact a public company and were currently contemplating additional subsequent transactions, two of which occurred. Despite their agreement to pay an additional purchase price, Defendants now refuse to honor their contractual obligations.

8. Defendants' actions and omissions, among other things, violated various securities laws, breached fiduciary duties owed to Plaintiffs, and fraudulently induced Plaintiffs into selling their preferred shares to PFD, only to breach those agreements.

## PARTIES

9. Plaintiff Jonathan Marcus, as trustee of the Grace Preferred Litigation Trust (the **"Trust"**), is a California resident. Mr. Marcus (the **"Trustee"**) is a partner in Broadbill Investment Partners, L.P., which is one of the Settlors (as defined herein). Mr. Marcus is not receiving compensation for his work or role as trustee of the Trust in connection with this lawsuit beyond reimbursement of actual expenses. The Trust was formed by the Settlors for the purpose of consolidating decision-making authority and reducing litigation costs, and holds claims for individuals and entities who sold their Series B Cumulative Preferred Stock and Series C

Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (the "**PFD Agreements**" as discussed below). The entities and individuals represented by the Trust are collectively referred to herein as the "**Settlors.**"

10. Defendants have objected to prosecution of the claims brought herein by the Trustee.[2] Thus, to the extent any claims, causes of action, or rights belonging to the Settlors are precluded under contract or statute from passing to the Trust, then the individual Settlors assert their claims herein in their individual capacities. Settlors are as follows:

a. Lloyd I. Miller Trust A-4 sold its 81,835 shares of 8.75% Series B Cumulative Preferred Stock and 11,050 shares of 9.0% Series C Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below);

b. Milfam II, L.P. sold its 60,175 shares of 8.75% Series B Cumulative Preferred Stock and 42,721 shares of 9.0% Series C Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below);

c. Lenado Partners, Series A of Lenado Capital Partners, L.P. sold its 67,100 shares of 8.75% Series B Cumulative Preferred Stock and 79,000 shares of 9.0% Series C Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below);

d. Lenado DP, Series A of Lenado DP, L.P. sold its 8,000 shares of 8.75% Series B Cumulative Preferred Stock and 8,000 shares of 9.0% Series C Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below);

e. SPV UNO, LLC sold its 400 shares of 9.0% Series C Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below);

f. Nikos Hecht, individually sold his 18,564 shares of 8.75% Series B Cumulative Preferred Stock and 34,546 shares of 9.0% Series C Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below);

g. The Hecht Children's Trust II sold its 9,111 shares of 8.75% Series B Cumulative Preferred Stock and 16,954 shares of 9.0% Series C

[2] The Trust is a flow-through vehicle with recoveries to flow back to the Settlors.

Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below);

h. Broadbill Partners, LP sold its 102,691 shares of 8.75% Series B Cumulative Preferred Stock and 201,746 shares of 9.0% Series C Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below);

i. Broadbill Partners II, LP sold its 18,091 shares of 8.75% Series B Cumulative Preferred Stock and 23,292 shares of 9.0% Series C Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below);

j. Costa Brava Partnership III LP sold its 355,888 shares of 8.75% Series B Cumulative Preferred Stock and 282,021 shares of 9.0% Series C Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below); and

k. Kurt Lageschulte IRRA sold its 1,300 shares of 8.75% Series B Cumulative Preferred Stock in W2007 Grace Acquisition I, Inc. to PFD Holdings, LLC (as discussed below).

**GRACE DEFENDANTS**

11. Defendant W2007 Grace Acquisition I, Inc. (**"Grace"**) is a Tennessee corporation with its principal place of business in Dallas County, Texas, located at 6011 Connection Drive, Irving, Texas 75039. Service of process may be effectuated on Grace pursuant to the nationwide service of process permitted under § 27 of the 1934 Exchange Act and 15 U.S.C. §78aa by serving Grace's Chief Executive Officer and director, Todd P. Giannoble, at its principal place of business located at 6011 Connection Drive, Irving, Texas 75039.

**GOLDMAN AFFILIATE DEFENDANTS**

12. Defendant PFD Holdings, LLC (**"PFD"**) is a Delaware limited liability company with its principal place of business (c/o Whitehall Parallel Global Real Estate Partnership 2007) located at 200 West Street, New York, NY 10282. Upon information and belief, no members of Defendant PFD Holdings, LLC maintain citizenship in California.

13. Defendant Goldman Sachs Realty Management, L.P. f/k/a Archon Group, L.P. ("**RMD**") is a New York limited partnership with its principal place of business in Dallas County, Texas, located at 6011 Connection Drive, Irving, Texas 75039. RMD is the employer in fact of each of the individual "Director Defendants" named below, who were responsible for orchestrating the deals that form the bases of this lawsuit.

**DIRECTOR DEFENDANTS**

14. Defendant Todd P. Giannoble ("**Giannoble**") is an individual who resides in Southlake, Texas and works in Dallas County, Texas. Mr. Giannoble is the CEO, Director, and President of Grace and the Managing Director of RMD. Mr. Giannoble may be served with process at 6011 Connection Drive, Irving, Texas 75039.

15. Defendant Brian T. Nordahl ("**Nordahl**") is an individual who resides in Southlake, Texas and works in Dallas County, Texas. Mr. Nordahl is the Vice President and Director of Grace and a Vice President of RMD. Mr. Nordahl may be served with process at 6011 Connection Drive, Irving, Texas 75039.

16. Defendant Gregory M. Fay ("**Fay**") is an individual who resides in Southlake, Texas and works in Dallas County, Texas. Mr. Fay is the Chief Financial Officer, Treasurer, Secretary, and Director of Grace, and is a Vice President of RMD. Mr. Fay may be served with process at 6011 Connection Drive, Irving, Texas 75039.

17. Defendant Daniel E. Smith ("**Smith**") is an individual who, upon information and belief, resides in and works in Daytona Beach, Florida. Mr. Smith is a former Director and the former Vice President and Secretary of Grace. He resigned on October 15, 2014. Prior to his resignation, Mr. Smith also served as the Vice President, Associate General Counsel, and

Director of Dispositions and Repositionings at The Goldman Sachs Group, Inc. Mr. Smith may be served with process at 1530 Cornerstone Blvd No. 100, Daytona Beach, Florida 32117.

18. Defendant Mark Ricketts (**"Ricketts"**) is an individual who, upon information and belief, resides and works in Dallas County, Texas. Mr. Ricketts is a former Director and former Vice President of Grace, and former Senior Vice President at Archon Hospitality, L.P. (which is now part of RMD). He resigned from RMD in March of 2015 and from Grace on April 1, 2015. Mr. Ricketts may be served with process at 6011 Connection Drive, Irving, Texas 75039.

19. Defendants Todd P. Giannoble, Brian T. Nordahl, Gregory M. Fay, Daniel E. Smith, and Mark Ricketts are collectively referred to herein as the "**Directors**." During the relevant time period, each of the Directors, as senior executive officers, agents, and or directors of Goldman-owned or controlled subsidiaries and affiliates, was privy to non-public information concerning Grace's business, finances, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Directors knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, Grace's preferred shareholders.

20. Each of the Directors is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on Grace's preferred shareholders by concealing material adverse facts and by causing Grace to deal in self-dealing transactions with GS Affiliates, including RMD, for whom several of the Directors were employed. The scheme (i)

deceived Grace's preferred shareholders regarding Grace's business, operations, management, including transactions involving GS Affiliates, and the intrinsic value of their preferred shares; (ii) deprived Grace's preferred shareholders of material information regarding Grace's operations, dealings, and finances including and by improperly taking Grace dark, thereby, depriving the preferred shareholders of a market in which to sell their shares; (iii) deprived Grace's preferred shareholders of dividends by siphoning those funds to themselves and other GS Affiliates via fees and sweetheart lending deals; and (iv) caused Settlors and other preferred shareholders to sell their preferred shares in Grace to GS Affiliates at depressed prices without relevant and material knowledge of facts necessary to make such transactions.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action because certain of the claims asserted herein arise under and pursuant to §§ 10(b), 14D, and 14E of the 1934 Securities Exchange Act (the "**1934 Act**") (15 U.S.C. §§ 78j(b) and 78t(a) & (d)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) by the SEC. This Court has jurisdiction over the subject matter of such claims pursuant to 28 U.S.C. § 1331 and § 27 of the 1934 Act (15 U.S.C. § 78aa). Pursuant to the PFD Agreements, New York state law applies. The Court has jurisdiction over the remaining claims pursuant to applicable principles of supplemental jurisdiction under 28 U.S.C. § 1367, because such claims arise out of the same circumstances and are based upon a common nucleus of operative fact.

22. The parties have agreed to venue in this Court.

23. Venue is further proper in this Court pursuant to § 27 of the 1934 Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this district.

## FACTS

### A. The Preferred Shares

24. Equity Inns, Inc. was a NYSE-listed REIT (ticker: ENN) with over 137 franchised select service hotel assets in its portfolio at the time Goldman acquired it. From August 2003 to February 2006, Equity Inns raised $146,250,000 in gross proceeds from the sale of 8.75% Class B Cumulative Preferred Stock and 8.00% Class C Cumulative Preferred Stock, both at an offering price of $25.00 per share (collectively, the **"ENN Preferred Stock"**). Equity Inns, Inc. agreed to pay its Series B preferred shareholders quarterly dividends at a rate of $0.546875 per share and its Series C preferred shareholders quarterly dividends at a rate of $0.562500 per share, which it did through the first quarter of 2008.

25. Equity Inns, Inc. contributed over $141 million of the net proceeds from these three issuances to its wholly-owned subsidiary Equity Inns Trust, which in turn contributed the equivalent of the gross proceeds to Equity Inns Partnership, L.P. In consideration for these contributions, Equity Inns Partnership L.P. issued Series B Preferred Units and Series C Preferred Units to Equity Inns Trust (the **"Partnership Preferred Units"**), the terms of which mirrored those of the Series B and Series C Cumulative Preferred stock.




**B. <u>Goldman Sachs' Leveraged Buyout of Equity Inns, Inc. - 2007 Merger</u>**

26. On October 25, 2007, Whitehall Street Global Real Estate Limited Partnership 2007 ("**<u>Whitehall</u>**"), a Goldman affiliate that operates Goldman's real estate investment funds, engineered a merger of Equity Inns, Inc. into W2007 Grace Acquisition I, Inc. ("**<u>Grace</u>**"). As a result of the merger, Grace became a wholly-owned subsidiary of W2007 Grace I, LLC ("**<u>Grace I</u>**") (together, referred to herein as "Grace"). Whitehall wholly owns Grace I.




27. After the merger, Grace's assets consisted of approximately 135 hotels located throughout the United States. Importantly, holders of ENN Preferred Stock were not permitted to vote on the merger. Grace's parent company, Whitehall, purchased all of the Equity Inns, Inc. common stock as well as certain common equity interests in the Operating Partnership (the "**Partnership LP Units**") at a price of $23.00 per share. Whitehall, however, did not purchase the Partnership Preferred Units held by Grace's wholly-owned subsidiary, Equity Inns Trust, nor did it purchase or assume the publicly-traded ENN Preferred Stock in the merger. The cost to Goldman to purchase the Partnership Preferred Units or ENN Preferred Stock would have been approximately $292.5 million based on the contractual $25 per share redemption price ($146.3 million in the aggregate for the Partnership Preferred Units and $146.3 million in the aggregate for the ENN Preferred Stock).

28. Instead and without consulting with holders of ENN Preferred Stock, Whitehall kept all of the Partnership Preferred Units outstanding, and cancelled all of the ENN Preferred

Stock and converted it into the right to receive 8.75% Series B Cumulative Preferred Stock and of 9.0% Series C Cumulative Preferred Stock in Grace (together, the **"Preferred Shares"** or **"Preferred Stock"**[3]), on a one-to-one basis.




29. Settlors collectively owned 1,422,485 shares of the Preferred Stock.

30. To fund the merger, Whitehall induced Grace to enter into a $1.8 billion dollar debt financing with Goldman Sachs Mortgage Company (**"GSMC"**) secured by a first mortgage on 111 of Grace's hotels (the **"GSMC Loan"**) and liens on other assets (discussed in detail infra). In conjunction with the GSMC Loan, Whitehall issued a payment guaranty of $350 million to GSMC (the **"Payment Guaranty"**).

31. Unbeknownst to the Preferred Shareholders, on October 25, 2007, Grace I entered into an Amended and Restated Keepwell Agreement with Grace (the **"Keepwell Agreement"**), whereby the new parent, Grace I, stated that it "desire[d] to take certain actions to enhance and

[3] Holders of the Grace Preferred Shares or Preferred Stock are referred to herein as the "**Preferred Shareholders**."

maintain the financial condition of [Grace]…in order to allow [Grace] to satisfy its obligations to holders of the [Preferred Shares]." Essentially, the Keepwell Agreement provided that Grace I would cover and pay dividends to Grace's Preferred Shareholders upon demand by Grace or when legally obligated. Grace (along with the other Goldman entities) concealed the Keepwell Agreement from the public and Settlors until after Settlors sold their shares back to Goldman. The Keepwell Agreement was eventually disclosed as part of the SEC's Consent Decree entered earlier this year.

## C. Grace Suppresses the Secondary Market for Shares

### 1. Goes "Dark" and refuses to disclose material information.

32. Immediately following the merger, Grace via its self-interested Goldman Directors, upon information and belief, took a series of steps to take Grace "dark." When Grace went dark it concealed details of its self-dealing transactions from its Preferred Shareholders and circumvented certain SEC regulations to prevent the flow of company information outside of the Goldman circle.

33. First, when Grace issued the new Preferred Shares that, unlike their predecessor NYSE-listed and DTC-eligible ENN Preferred Shares, were not DTC (Depository Trust Company) trade-eligible. This made it significantly more expensive and incredibly difficult to trade the Preferred Shares thereby decreasing the potential investor pool.[4]

34. Next, on November 6, 2007, Grace filed a Form 15 with the SEC to deregister representing that it had less than 300 Preferred Shareholders of record. Upon filing of its Form 15, Grace delisted from the New York Stock Exchange, ceased filing financials and reports with the SEC, ceased providing same to its Preferred Shareholders, and implemented restrictions that

[4] Securities that are not DTC-eligible require the physical transfer of paper certificates in order to transfer the shares, which is an extremely outdated and impracticable means of transfer. Because of the difficulties and often cost-prohibitive expense involved, some brokerage firms refuse to trade these types of securities all together.

made it challenging for Preferred Shareholders to obtain current, complete, and accurate information about the company.

35. However, by at least the beginning of 2013, Grace was in fact a public company with more than 300 preferred shareholders. In its Cease and Desist Order, entered in settlement with Grace, the SEC did not conclude one way or another whether Grace should have been filing public disclosures prior to January 1, 2013. The basis of the SEC's Cease and Desist Order was that there were more than 300 shareholders of record in 2013 and 2014. However, the number of shareholders of Grace has continually decreased since 2008, especially since 2012 when PFD began acquiring a majority of Grace's outstanding Preferred Shares. Since the company was "dark" and Grace would not facilitate a transfer of shares through the DTC, only existing shareholders – and PFD – were willing to purchase shares.

**2. <u>Grace revokes its REIT Status and Suspends Dividends</u>**

36. On March 31, 2008, Grace revoked its REIT election under Section 856(c)(1) of the Internal Revenue Service Code. This eliminated obstacles placed by Equity Inns, Inc.'s 2003 prospectus, and Grace's Charter, which prohibited any shareholder from owning more than 9.9% of either Series B or Series C Preferred Stock (the **"<u>Ownership Limitation</u>"**), so as not to jeopardize the company's REIT status.[5]

37. Once Grace revoked its REIT Status, Goldman could avoid the Ownership Limitation and later purchase those interests at bargain prices. Which they did. This also allowed them to replace the prior hotel lease agreements with agreements that would benefit GS Affiliates at the expense of the Preferred Shareholders. Which they did.

---

[5] *See* Grace's Amended and Restated Charter at § (b)(5)(A) ("However, in order to ensure that the corporation will continue to meet the requirements for qualification as a REIT, the Series B Preferred Stock will be subject to the … "Ownership Limit." On or after August 11, 2008, the Corporation may redeem shares of Series B Preferred Stock, in whole or from time to time in part, at a cash redemption price equal to 100% of the Liquidation Preference plus all accrued and unpaid dividends.").

38. Shortly thereafter, in May of 2008, Grace and its Directors suspended dividends on all Preferred Shares. Pursuant to a press release dated June 30, 2008, the company announced it would not declare a second quarter dividend due to a "cash trap" under the GSMC Loan and that it was "in the company's best interest to not declare and pay dividends" at that time. Specifically, the Directors claimed Grace could not pay dividends "in connection with certain covenants contained in the loan documentation put into place in October 2007," which is the same excuse that was given to Preferred Shareholders every quarter thereafter.[6]

39. As of February 27, 2015, the date the transaction closed by which Grace transferred substantially all of its assets to a third-party (the "**ARC Transaction**"), Grace had approximately **$88.4 million** in improperly accrued, undeclared dividends.

### 3. Grace's Amended and Restated Charter Purposely Prejudiced Preferred Shareholders' Rights

40. On January 23, 2008, Grace issued its Amended and Restated Charter under the laws of the State of Tennessee (the "**Amended Charter**"). The Amended Charter, among other things, prohibits the payment of dividends on junior stock, including common shares, unless dividends are current on the Series B and C Preferred Shares.

41. The Amended Charter provides the Preferred Shareholders the right to elect two new independent directors to Grace's board in the event Grace fails to declare dividends for six or more quarters. *See* the Amended Charter at § (5)(6)(B). These independent directors would then act on behalf of the Preferred Shareholders and represent their interests.

42. Grace stopped paying dividends after the first quarter of 2008. However, the Directors stymied the Preferred Shareholders' efforts to exercise their right elect the two new

[6] *See* http://www.snl.com/Cache/1500017530.PDF?Y=&O=PDF&D=&FID=1500017530&T=&IID=103147 (last accessed on July 28, 2015).

independent directors. For example, when the Preferred Shareholders attempted to hold a special meeting to elect independent directors, the Directors engaged in activities which ensured a lack of quorum and frustrated the entire election. After several of the Preferred Shareholders' failed attempts to exercise their right to elect independent directors, upon information and belief, GS Affiliates purchased a majority of the Preferred Shares to frustrate a vote. *See id.* at § (5)(6)(C) (requiring a 66.66667% affirmative vote or consent of outstanding Preferred Shares in order to elect two new directors). Goldman only needed 33.33% to prevent a quorum by abstaining from voting. By August 2012, a GS Affiliate – PFD – had acquired 35% of the Preferred Shares and by August 2013 held 59% of the Preferred Shares.

43. The Amended Charter also requires that the Preferred Shareholders receive a Liquidation Preference of $25 per share plus any unpaid and accrued dividends before any payment or distribution to junior shareholders in the event that Grace is wound-up, dissolved, or voluntarily or involuntarily liquidated (the "**Liquidation Preference**"). *See id.* at § 5(b)(4)(A).[7]

**4. Related Transactions and Excessive Fees Paid to Affiliates**

44. In addition to serving as directors or officers of Grace, the Directors were high-ranking employees of RMD (formerly known as Archon), a GS Affiliate. After Grace suspended dividends and its public reporting under the 1934 Act, its self-interested Directors elected to pay tens of millions of dollars in various fees and interest charges to themselves by causing Grace to pay those fees to the GS Affiliates, including the Directors' employer: RMD. Upon information and belief, this positively impacted the compensation the Directors received as employees of RMD.

[7] Notably, the Amended Charter provides that liquidation does not include "a sale or transfer of all or substantially all of the Corporation's assets." *See id.* at § 5(b)(4)(C). However, Section 48-22-102 of the Tennessee Code provides that a corporation may only sell all or substantially all of its assets outside the regular course of its business if it first obtains majority vote of its shareholders, which Grace never obtained.

45. For example, in 2007, the Directors caused Grace to enter into an asset management agreement with RMD, the full details of which were undisclosed to Preferred Shareholders until this year. Each of the Directors currently serves as a high-ranking officer or employee of RMD. Despite the obvious conflict of interest, Grace paid RMD $3.95 million in fees in 2008, $5.975 million in fees in 2009, $6.3 million in fees in 2010, $6.5 million in fees in 2011, $6.0 million in fees in 2012, $7.3 million in fees in 2013, and $3.1 million in fees in 2014. By doing so, the Directors caused Grace to pay a dividend on account of its equity, albeit one disguised as compensation, while depriving the Preferred Shareholders of their dividends.

46. The Directors also approved transactions that paid related transaction fees to other GS Affiliates including a $10 million dollar "advisory services fee" in connection with the merger, an $18 million dollar "arranging fee" in connection with the GSMC Loan, both of which were paid to an undisclosed "GS Affiliate." GS Affiliates also received a $9.9 million dollar "componentization fee" associated with the componentization of the GSMC Loan on February 12, 2008. The 2008 componentization of the GSMC Loan resulted in the creation of one "Mortgage Loan" and seven "Mezzanine Loans," which covered Grace's 111 "**OP Hotels**."

**5. The Recapitalization Transaction**

47. In June of 2009, Grace and the Directors entered into an undisclosed series of self-interested "recapitalization transactions," that greatly benefited the GS Affiliates at the Preferred Shareholders expense (the **"Recapitalization Transaction"**).

48. First, a wholly-owned subsidiary of Grace, referred to only as "First Mezzanine Borrower" made a "proportionate and voluntary prepayment of $15.2 million to reduce the outstanding balance of the First Mezzanine Loan."

49. Second, Grace and the Directors gave GSMC a 97% equity interest in the entity that owned the OP Hotels[8] used to secure the GSMC Loan, which was exercisable upon Grace's payment in full of the GSMC Loan and First Mezzanine Loan (the **"Equity Option"**). In return, GSMC "forgave" $544.8 million in debt on the GSMC Mezzanine Loans (remaining 2nd through 7th Mezzanine Loans). Importantly, as revealed below, the Equity Option was not effective or exercisable until certain of the GSMC Loans were paid in full. The terms of the transaction imply that Grace and the Directors valued the equity created by the debt forgiveness at approximately $562 million.

50. However, Grace and the Directors failed to disclose the basis of its valuation to its shareholders, despite their requests. Grace's financial statements make no reference to a fairness opinion with regard to the Recapitalization Transaction. In fact, the number of assets involved in the Recapitalization Transaction was not disclosed until on or about March 2012, when Grace finally disclosed the number of properties owned by the entity in which it had granted a 97% interest. Further details of the transactions were not disclosed until May 2015.

51. Indeed, contrary to Defendants' valuation, comparable hotel transactions during that same timeframe (March 1 to July 1, 2009) indicated an average per-room price of roughly $132,750 per room (or "key"). That suggests: (1) the value of Grace's OP Hotels was closer to $1.694 billion; and (2) the net of the $1.04 billion of remaining mortgage and mezzanine debt and equity value of the 97% subsidiary, was worth $654 million. The difference between these implied equity values is approximately $92 million. Thus, the Equity Option granted to GSMC is at its core a conveyance of value or gift of nearly $92 million, which equates to a roughly $15.75 loss per share of Preferred Stock.

[8] At the time, Grace only identified the entity as "one of [Grace's] subsidiaries." The nature and details of the Recapitalization Transaction were only revealed in the filings compelled by the SEC's Cease and Desist Order.

52. Fourth, upon the exercise of the Equity Option, Grace concealed that it entered into another asset management agreement with GSMC whereby Grace or its GS Affiliates would provide asset management services to GSMC. GSMC would pay Grace's GS Affiliates a portion of the distributions GSMC received from its 97% ownership interest. By delivering substantially all the value in the OP Hotels, representing an operating level interest in approximately 80% of Grace's properties, Goldman manufactured and layered expenses to enable it to pull funds out of Grace in a way that allowed Grace to avoid paying dividends to Preferred Shareholders or creating conflict with lenders.

53. Because the Preferred Shares are "cumulative," Whitehall was required to pay all accrued dividends on the Preferred Shares before it could pay itself a dividend on account of its equity in Grace. However, by secretly causing Grace and its subsidiaries to enter into a series of agreements with the GS Affiliates, Whitehall could make Grace pay dividends *to* equity without them being *on* equity. This allowed the GS Affiliates to "leapfrog" the Preferred Stock with regard to payment of dividends and payment of proceeds upon dissolution or liquidation of Grace. And by entering into an undisclosed asset management services agreement with GSMC, Whitehall pilfered additional Grace assets by paying unnecessary and unsubstantiated fees to its sister companies, thereby further depriving the Preferred Shareholders of cash flows which otherwise would have been paid as dividends.

54. Fifth, on June 29, 2009, W2007 Finance Sub and WH Parallel, the two owners of Grace I (Grace's parent company), entered into an undisclosed "sharing agreement" with GSMC (the "**Sharing Agreement**"). Under the Sharing Agreement, as a "priority distribution," GSMC received 25% and W2007 Finance Sub and WH Parallel received 75% until distributions to W2007 Finance Sub and WH Parallel reached $190 million, at which point the parties swapped

distribution percentages until GSMC received $485.5 million. Under this arrangement, by the time GSMC recovered the $544 million of value it lost in debt "forgiveness," W2007 Finance Sub and WH Parallel (GS Affiliates) **also** received $352 million in proceeds from Grace. In sum, this Sharing Agreement permitted the parent equity holders of Grace (GS Affiliates) to benefit from further siphoning of assets away from Preferred Shareholders, on top of the Recapitalization Transaction that was severely unfair to Grace's Preferred Shareholders to begin with.

55. The Recapitalization Transaction also caused the price of Grace's shares to plummet. Whitehall with the assistance and consent of Grace and its Directors, effectively engineered an end-around of Grace's capital structure and diverted the Preferred Shareholders dividend payments to GS Affiliates to pay for Goldman's manufactured "fees." By 2010, Grace's shares were nowhere near the $25 per share price contemplated by the Liquidation Preference. Indeed, on the thinly traded over-the-counter (**"OTC"**) market, the Preferred Shares were trading at roughly $8 per share, or a third of what they would have been, but for the Recapitalization Transaction.

**6. Release of Whitehall from Payment Guaranty**

56. Also in June of 2009, in another undisclosed transaction, Whitehall paid $175 million to GSMC under the Payment Guaranty. Whitehall's payment of $175 million to GSMC reduced the outstanding balance of the Mortgage Loan. In connection, GSMC restructured the Mortgage Loan to release Whitehall from the remaining $175 million under the Payment Guaranty. However, the terms of the restructure Goldman negotiated with its affiliate lender (GSMC) caused Grace to pay $117 million in fees and increased interest charges to GS

Affiliates, effectively shifting Whitehall's obligation under the Payment Guaranty to Grace and further diverting funds that should have been used to pay dividends.

57. Thus, in the span of 3 months, Grace went from principally calling an equity commitment from its primary shareholder, restructuring the GSMC loan secured by "substantially all of the Company's assets," and facing the very near-term maturity of substantially all of its debt (originally due November 2009), to being in such fine shape that its equity sponsor and parent, Whitehall, was conveniently relieved of its funding obligation to GSMC to the tune of $175 million, but at the expense of Grace's Preferred Shareholders.

58. On September 29, 2009, Grace paid *another* $5 million on the GSMC Loans to reduce their balance. This is yet another example of Grace secretly using funds to benefit GS Affiliates that otherwise should have been used to pay dividends to Preferred Shareholders.

**7. <u>The 2010 Loan Modification</u>**

59. In December 2010, Grace again modified its GMSC Loan to substantially increase the interest rate[9] and extend the maturity from November 2010 to November 2015 (the **"<u>2010 Loan Modification</u>"**). Assuming no change in LIBOR rates, the Loan Modification cost Grace and its Preferred Shareholders a staggering $230 million during the term of the modification, on top of what it otherwise would have paid. Of the $230 million, the Directors caused Grace to pay approximately $41 million in fees and interest charges to GS Affiliates, which equates to approximately $7 per Preferred Share in lost dividends. The remainder was paid to GSMC, the GS Affiliate lender. Barring further additional fees, between 2007 -2015, Grace opted to pay at least $310 million in fees and increased interest to its GS Affiliates, an

[9] Grace agreed to change the interest paid to its GS Affiliate from 30-day LIBOR + 204bps (2.28% at 12/31/09), to 90-day LIBOR + 471bps, with a 1% LIBOR floor (5.71% at 12/31/10), stepping up 50bp each November until the anticipated maturity of November 2015.

amount which dwarfs the Liquidation Preference of the Preferred Stock (including accrued, but unpaid dividends owed through that date), which was approximately $180 million in 2010.

**8. The Equity Option is Amended and Transferred**

60. On September 30, 2011, GSMC transferred the Equity Option to another, undisclosed, GS Affiliate, which then on July 13, 2012, transferred the Equity Option to WNT Holdings, LLC (“**WNT**”), a Whitehall-owned subsidiary and GS Affiliate. Settlors only learned that Grace’s parent, Whitehall, was the entity who had effectively acquired the Equity Option as a result of the SEC’s Cease and Desist Order. WNT acquired the Equity Option for $175 million, which is suspiciously the same amount of the balance on the Payment Guaranty which Whitehall was released from by GSMC. Notably, in Grace’s newly-filed 2013 10-K, Grace valued this 97% interest at $204 million. Thus, by mid-2012, Whitehall essentially owned and controlled the Equity Option.



61. The effect of the above-described actions amounted to shareholder oppression. Without adequate and fair reporting, and DTC-eligible shares, Grace effectively stripped the Preferred Shareholders of a market for their once publicly-traded shares. As a result, the value of the Preferred Stock plummeted from its approximate $17 per share valuation at the time of the merger in 2007 to as low as 1 cent per share on the OTC market. Thus, it was difficult, if not impossible, for Preferred Shareholders to sell their shares on the open market, let alone for a fair or reasonable price.

**D. <u>PFD Disguised "Tender Offer"</u>**

62. Upon information and belief, Defendants intended that Grace going dark would strip the Preferred Shareholders of a market for their shares and force them to sell to the only interested buyers – Goldman – the only parties with inside information about Grace's activities, finances, and strategies. Defendants succeeded. Despite the positive upswing in the real estate market, in 2012, the Goldman-led shareholder oppression caused Grace's Series B and C shares to trade at an average of $4 per share when Preferred Shareholders could even find a willing buyer. At this point, Settlors were left with no market for their now seemingly worthless stock, especially given the volume of shares Settlors held.

63. Grace itself could not purchase the outstanding Preferred Shares when it was in arrears on dividends. Moreover, even if it could, Grace would have had to pay Preferred Shareholders a redemption price, or a liquidation preference in in connection with the ARC Transaction it planned to enter. Thus, to get around these hurdles, upon information and belief, Goldman/Grace created a shell holding company to buy back over 59% of the outstanding and issued Preferred Shares.

64. On July 10, 2012, Goldman created PFD, which has no independent operations but to serve as a shell holding company to acquire the Preferred Shares for pennies on the dollar. A former Goldman executive recently joked to the press that PFD was actually an acronym for "pretty f***ing dodgy." PFD is a wholly-owned subsidiary of Whitehall and operated by the Directors. After formation, PFD began acquiring shares of Grace's Preferred Stock. In August 2012, PFD purchased 2,018,250 shares of Grace's outstanding Preferred Stock.

65. On September 17, 2012, a press release disclosed for the first time that a "sister company" of Grace, PFD, had acquired 35% of the outstanding shares of Grace's Preferred Stock. This would have violated the Amended Charter's Ownership Limitation put in place to protect the equity interests, had Grace not purposefully previously revoked its REIT status, allowing Goldman/Grace to deceptively maneuver around those restrictions. Despite stating that it intended to acquire the remaining Preferred Shares, PFD failed to file requisite Tender Offer disclosures. Moreover, at this time, Grace was being investigated by the SEC for miscounting the number of shareholders, which had allowed it to not file the requisite reports and financials required by companies with more than 300 shareholders of record.

### E. Settlors Enter PFD Agreements

66. Disputes arose between Settlors and Grace concerning the Preferred Stock and the management of Grace. As a result of the foregoing Goldman-led shareholder oppression, undisclosed transactions, and following ongoing discussions with two of Grace's directors, Fay and Giannoble, on or about August 9, 2013, Settlors entered into a series of confidential "Stock Purchase Agreements" (the "**PFD Agreements**"). Under those agreements, Settlors transferred Series B Cumulative Preferred Stock and Series C Cumulative Preferred Stock to PFD, on the terms and for the consideration set forth in those agreements.

67. It appears that PFD simply served as a shell vehicle for Grace to avoid the Amended Charter's prohibition on repurchasing Preferred Stock while in arrears on dividends and its redemption and liquidation preference prices. It also allowed Grace to further stymie the Preferred Shareholders' election of two independent directors, by owning a majority of the Preferred Shares. Up until the final stages of negotiations, after Settlors entered the required confidentiality and standstill agreements with Grace (not PFD), Settlors believed they were negotiating with and selling their shares to Grace. All negotiations leading up to the PFD Agreements were made with Giannoble and/or Fay, who were both Directors of Grace. Indeed, even when the transfer of funds to Settlors in connection with this transaction was made, it was unclear who the sale was actually made to, as the funds came from Goldman, not PFD.

68. On August 13, 2013, Grace publicly disclosed and confirmed that Settlors shares had been acquired by PFD. As noted in the press release, by purchasing Settlors' shares, PFD acquired an additional 24.3% stake in Grace's Preferred Stock, bringing its ownership of outstanding and issued Preferred Shares to 58.8%. The press release went on to state that "[i]n light of these events, the Company has postponed the special meeting of the preferred shareholders for the purpose of electing two additional directors to the Company's Board of Directors." Settlors later learned that in December 2014, PFD purchased an additional 10,000 shares of Preferred Stock from a party or parties believed to be unrelated to the Settlors. As a result of these purchases, PFD's ownership stake in Grace's Preferred Stock is now well above 59%.

69. Settlors negotiated the Additional Purchase Price clause, which allowed for additional compensation upon certain events

## F. Tennessee Class Action Lawsuit

70. On September 13, 2013, a group of Preferred Shareholders filed a class action lawsuit against Grace, the Directors, and certain GS Affiliates based generally on the foregoing acts of shareholder oppression, styled *Johnson et al v. W2007 Grace Acquisition I, Inc. et al*, Cause No. 2:13-cv-02777-SHM-dkv in the U.S. District Court, Western District of Tennessee (the "**Tennessee Lawsuit**").[10]

## G. Subsequent Transaction No. 1 – ARC Transaction

71. In June of 2014, Grace disclosed that on May 23, 2014, ***Grace and certain GS Affiliates entered into the real estate sale agreement*** (the Original Purchase Agreement) with ARC ***to sell all of Grace's assets*** for over $1.9 billion (the "**ARC Transaction**").[11] The ARC Transaction effectively was a liquidation of Grace's assets, or constituted an event, condition, transaction, agreement, contract or other arrangement that had the effect of a liquidation, and triggered the payment of the Liquidation Preference to Preferred Shareholders under the Amended Charter, thereby resulting in a distribution of Stockholder Consideration.

72. Around the same time, Grace acknowledged that it estimated the "reasonable fair present value of the proceeds that could be distributed to holders of the Preferred Stock as a result of the ARC Transaction, as announced, to be approximately $18.50 per share…," which required payment to the Settlors of additional compensation.

73. The ARC Transaction closed on February 27, 2015, for approximately $1.808 billion, which equates to $22.05 per share of Preferred Stock (despite the removal of 10 hotels from the transaction). While seemingly low in light of the almost $40 per share Liquidation

[10] The Tennessee Lawsuit brought claims against Grace, the Directors, and GS Affiliates for breaches of contractual, fiduciary, and statutory duties owed to the Preferred Shareholders.
[11] The Original Purchase Agreement was amended on November 11, 2014, reducing the number of hotels being purchased from 126 to 116.

Preference, the $22.05 figure assumes full prior payment of over $20 million in accrued asset management and disposition fees which RMD negotiated for itself. This would have triggered Plaintiffs' right to additional compensation under the PFD Agreement.

**H. <u>Subsequent Transaction No. 2 – Tennessee Class Action Settlement</u>**

74. On August 22, 2014, a press release announced that Grace and its GS Affiliates entered into a Memorandum of Understanding on August 20, 2014 with the Claimants in the Tennessee Lawsuit (the "**<u>MOU</u>**") and that the settlement amount was based on the ARC Transaction. This is the first time the Settlors learned about the MOU. Under the MOU, Grace agreed to pay current Preferred Shareholders involved in the Tennessee Lawsuit at least $26 per share upon surrender of their Preferred Stock, and pay $6 million into a settlement fund for individuals who sold their Preferred Shares on or after October 25, 2007 and suffered a recognized loss. However, the MOU and, later, Stipulation and Agreement of Settlement specifically excluded any private sales of Preferred Stock made to PFD from the settlement.

75. The settlement in the Tennessee Lawsuit triggered Plaintiffs' right to additional compensation under the PFD Agreement. . Upon information and belief, Grace purposefully delayed entering the MOU to avoid paying Plaintiffs additional consideration. This belief is based upon the timing of the settlement with respect to the ARC Transaction, which effectively required settlement with the class action, the lack of activity in the class action subsequent to the announcement of the ARC Transaction, the suspicious timing of the MOU, and Defendants' tacit acknowledgement that the MOU was contingent upon the ARC Transaction, which was announced more than two months prior.

76. The ARC Transaction essentially required settlement of the Tennessee Lawsuit in order for Grace to buy-out the outstanding Preferred Shares. The settlement allowed Grace to:

(1) acquire the Preferred Shares without needing formal appraisals performed or comply with other statutory requirements required in a liquidation sale; (2) avoid the Liquidation Preference under the Amended Charter, since the ARC Transaction concerned a sale of substantially all of Grace's assets outside the ordinary course of its business; and (3) avoid disclosure and public filing obligations related to a tender offer.

77. Thus, as soon as Grace committed to the ARC Transaction (something that it must have done much earlier than the May 2014 announcement, given the levels of due diligence involved on more than 100 hotels) it had to settle the class action. As soon as the ARC Transaction was publicly announced, docket activity in the class action ceased save for motions for extensions of time on pending motions.

## I. <u>Undisclosed Material Goldman Events</u>

78. At the time Settlors sold to PFD, there were various self-dealing transactions between the GS Affiliates and Grace occurring behind the scenes. Each of the following items should have been *publicly* disclosed by Grace to its Preferred Shareholders via filings with the SEC at the time the Settlors entered the PFD Agreements.

a. *Grace miscounted the number of Preferred Shareholders to avoid SEC Filings.*

79. From 2008 until the SEC's Cease and Desist Order earlier this year, Grace has been dark. Grace's Directors claimed that because Grace had less than 300 shareholders, it was not required to make disclosures to its stockholders. However, unbeknownst to the Preferred Shareholders, Grace intentionally miscounted shareholders to avoid reporting various transactions to the SEC. This precluded Preferred Shareholders, including Settlors, from obtaining the material information regarding Grace's self-dealing transactions, finances, ability to pay dividends, and future prospects. It also allowed Grace to enter the PFD Agreements and

avoid insider trading claims. Although various Preferred Shareholders objected to the lack of public filings, Grace refused to make disclosures. As a result, certain Preferred Shareholders brought this matter to the attention of the SEC in 2013.

80. On March 17, 2015, the SEC issued a Consent Order wherein it found that in January 1, 2014, Grace had more than 300 holders of record of the Preferred Stock and had been miscounting the number of Preferred Shareholders by incorrectly aggregating three separate custodial accounts and three corporate entities as one holder of record. As a company with more than 300 preferred shareholders, the SEC determined Grace should have filed disclosures and reports required of public companies. The SEC ordered Grace to file a Form 10-K for 2013 and seven periodic and other reports for 2013 and 2014 within 120 days and fined Grace $640,000.

81. On May 1, 2015, pursuant to SEC order, Grace filed the first of these required back 10-Ks with the SEC. In those filings, Grace provided for the first time various agreements covering the above-described self-dealing transactions, such as the Keepwell and Sharing Agreements, and events that had led to the steep decrease in value of the Preferred Stock, which if properly and publicly disclosed would have prevented Settlors and likely other Preferred Shareholders from selling to Grace via its alter ego PFD.

b. *Grace failed to disclose its plan to sell all of Grace's assets.*

82. As early as 2012 or 2013, Goldman began orchestrating a deal that would lead to the ARC Transaction. By way of background, Settlors have highlighted the following events:

a. Goldman began buying up a majority of Grace's Preferred Shares at the end of 2012;

b. On January 22, 2013, American Realty Capital Trust (**"<u>ARCT</u>"**) merged with Realty Income Corporation. Goldman was the financial advisor to ARCT in that merger;

c. On July 25, 2013, the American Capital Hospitality Trust, Inc. ("**ARC**") was formed. However, ARC waited to file its Registration Statement with the SEC until a few days after the PFD Agreements were signed by Settlors, whereby PFD became the holder of 59% of the outstanding Preferred Stock;

d. The ARC Transaction only provided for a 16-day due diligence period to cover all of Grace's 126 hotels[12]; and

e. ARC funded the $50 million earnest money deposit on May 27, 2014, in advance of the June 8, 2014 deadline.

Thus, it appears that ARC had completed its due diligence in advance of the parties' entry into any real estate agreement.

83. To sell Grace's portfolio of hotel assets, Grace engaged in a series of refinancing transactions in early 2014, in which Grace refinanced the GSMC Loan with a $976 million dollar loan by German American Capital Corp. ("**Deutsche Bank**"), and the cash trap under the GSMC Loan ceased. Paying off these notes triggered WNT's Equity Option. WNT exercised the Equity Option on April 11, 2014. Once WNT exercised the Equity Option, the Grace and GSMC asset management agreements became effective. As a result, Grace or its GS Affiliates now provided asset management services to WNT in exchange for a significant portion of distributions received by WNT through its 97% ownership interest.

## CAUSES OF ACTION

### COUNT 1 – BREACH OF CONTRACT UNDER NEW YORK LAW (PFD)

84. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

85. Settlors and PFD entered the PFD Agreements, which are valid and enforceable contracts.

[12] Furthermore, upon information and belief, the ARC Transaction's due diligence on Grace's hotels was completed on or before March 14, 2014, when the Phase I Environmental Site Assessments on 106 of Grace's hotel properties was completed. This is more than two months before the ARC Transaction was announced,

86. Settlors performed their obligations under the PFD Agreements by transferring their 1,422,485 shares of Preferred Stock in Grace to PFD.

87. PFD materially breached the PFD Agreements by failing to pay to Settlors the Additional Purchase Price in connection with the ARC Transaction.

88. PFD further materially breached the PFD Agreements by failing to pay to Settlors the Additional Purchase Price in connection with the MOU entered in the Tennessee Lawsuit

89. PFD's material breaches of the PFD Agreements caused Settlors to suffer damages that it otherwise would have received under the PFD Agreements, but for PFD's breaches.

**COUNT 2 – BREACH OF IMPLIED DUTY OF GOOD FAITH UNDER NEW YORK LAW**
**(PFD)**

90. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

91. Settlors and PFD entered the PFD Agreements.

92. PFD delayed entering the MOU to avoid paying any Additional Purchase Price under the PFD Agreements.

93. PFD's implied promise not to delay entering into a Subsequent Transaction for the purpose of denying Settlors the Additional Purchase Price is not contradicted by the terms of the PFD Agreements.

94. PFD's breach is not a breach of any express provision found in the PFD Agreements.

**COUNT 3 – RESCISSION OF RELEASE CONTAINED IN PFD AGREEMENTS**

95. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

96. New York common law applies to Settlors' rescission claims

97. Settlors are entitled to rescind the release provision contained in the PFD Agreements because of Defendants' material omissions which fraudulently induced Settlors into the PFD Agreements, Defendants' inability to perform the Additional Purchase Price provision of the PFD Agreements after entering into those agreements and/or by materially breaching the PFD Agreements by failing to pay the Additional Purchase Price as set forth in Counts 1 and 2 above, which substantially defeated the purpose of the PFD Agreements.

98. From November 2012 through August 2013, Goldman engaged in a fraudulent scheme to induce Settlors to sell their Preferred Shares back to Grace (via its alter ego PFD) by entering the PFD Agreements. PFD could only act by and through its individual agents, whose individual acts and/or omissions in connection with the negotiations with Settlors were fraudulent. Giannoble and Fay are natural persons who negotiated with Settlors to enter into the PFD Agreements. At all relevant points in time, Giannoble and Fay were directors and officers of Grace, the president and vice president of RMD, and agents of PFD, and were acting for the benefit of these entities collectively, to the extent these entities had any corporate separateness.

99. During this time, Defendants were aware that Grace had more than 300 shareholders of record and willfully lied about the number of shareholders to avoid making disclosures required of a public company under the 1934 Act. This was a fact that was material to Settlors and should have been disclosed by Defendants by fact of the respective fiduciary duties they owed to Settlors. This willful omission of material fact was done in order or in part to accomplish the fraudulent inducement of Settlors to enter the PFD Agreements' release provision.

100. During the course of these negotiations, Defendants owed Settlors a duty to disclose that Grace was in-fact a public company under their fiduciary duties and as parties who possessed superior knowledge, not readily available to Settlors, when Defendants knew that Settlors were acting on the basis of mistaken knowledge. Specifically, Grace owed a fiduciary obligation to its Preferred Shareholders, which includes Settlors. Directors each were directors and officers of Grace, and in that capacity owed Grace's Preferred Shareholders, including Settlors, fiduciary duties. PFD, as a majority shareholder and as a shareholder exerting control of Grace, owed a fiduciary duty to the minority holders of Grace's Preferred Shares, including Settlors. Directors, and entities for which they acted– RMD, Grace, and PFD - knew that Settlors were ignorant of these facts and did not have an equal opportunity to discover the truth, but failed to disclose that Grace was a public company to Settlors prior to their entry into the PFD Agreements and releases contained therein.

101. If the release provisions contained in the PFD Agreements are not rescinded, Settlors will lack an adequate remedy at law.

**COUNT 4 - FRAUDULENT INDUCEMENT INTO CONTRACT UNDER NEW YORK LAW (ALTERNATIVELY)**
**(Grace, PFD, Giannoble, and Fay)**

102. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

103. New York common law applies to Settlors' fraudulent inducement claims

104. In the alternative to Settlors' breach of contract claim, from November 2012 through August 2013, PFD engaged in a fraudulent scheme to induce Settlors to sell their Preferred Shares by entering the PFD Agreements. PFD could only act by and through its individual agents, whose individual acts and/or omissions in connection with the negotiations with Settlors were fraudulent. Giannoble and Fay are natural persons who negotiated with

Settlors to enter into the PFD Agreements. At all relevant points in time, Giannoble and Fay were directors and officers of Grace, the president and vice president of RMD, and agents of PFD, and were acting for the benefit of these entities collectively, to the extent these entities had any corporate separateness.

105. PFD fraudulently induced Settlors to enter the PFD Agreements by failing to disclose:

a. that Grace was a public company which should have been making SEC disclosures;

b. that Grace was planning to sell all or substantially all of its assets to ARC;

c. the nature and terms of the Keepwell Agreement;

d. the nature and terms of the Sharing Agreement;

e. the existence and terms of other transactions Grace entered into with GS Affiliates; and

f. that Grace, through PFD, was engaged in a tender offer to purchase a majority of Grace's outstanding Preferred Shares; and

g. that by purchasing the Preferred Shares through its alter ego, PFD, at less than the redemption price or Liquidation Preference, Grace violated the terms of the Amended Charter.

(collectively, the **"Material Omissions"**).

106. The Material Omissions contained adverse, material, non-public information within Defendants knowledge. Specifically, Giannoble and Fay, acting as agents for PFD, engaged in written and electronic, telephone, and in-person communications with Settlors from November 2012 to August 2013, whereby Giannoble and Fay negotiated with Settlors to sell the Settlors' Preferred Shares. At no point during these negotiations did Giannoble or Fay, or anyone else acting on behalf of Grace or PFD, disclose the Material Omissions to Settlors. The Material Omissions were material because there was a substantial likelihood that a reasonable investor would consider such facts important in deciding whether to sell a security, because each

would significantly alter the total mix of information made available. The Material Omissions were material facts to Settlors in determining whether to sell their Preferred Shares via the PFD Agreements.

107. Grace owed a fiduciary obligation to its Preferred Shareholders. Giannoble and Fay, as directors and officers of Grace owed Grace's Preferred Shareholders fiduciary duties. PFD, as a majority shareholder and as a shareholder exerting control of Grace, owed a fiduciary duty to the minority holders of Grace's Preferred Shares, including Settlors.

108. Based on these fiduciary duties and based on the fact that each of the foregoing Defendants had superior knowledge of Grace's financial and other material information not available to Settlors, a fact which these Defendants were aware, Defendants had a duty to disclose the Material Omissions to Settlors, which they failed to do. In so doing, Defendants deprived Settlors of facts material to Settlors in determining whether to sell their Preferred Shares via the PFD Agreements.

109. As a result, Defendants were able to buy-back the Settlor's Preferred Shares at a steeply discounted price, making Grace's books more attractive for the future sale of its assets to ARC, which appears have been planned since 2012, and avoid having to pay Settlors' the larger Liquidation Preference it would have had to pay if it properly retired the Preferred Shares in connection with the ARC Transaction.

110. Giannoble and Fay, and entities for which they acted– RMD, Grace, and PFD - knew that Settlors were ignorant of these facts and did not have an equal opportunity to discover the truth.

111. Grace, PFD, Giannoble, and Fay intended to induce Settlors to enter the PFD Agreements by failing to disclose these facts.

112. Settlors suffered injury as a result of acting without knowledge of the undisclosed facts.

**COUNT 5 – BREACH OF FIDUCIARY DUTY UNDER TENNESSEE LAW**
**(Grace, Directors, and PFD)**

113. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

114. Grace is a Tennessee corporation. Settlors' breach of fiduciary duty claims against the Directors, Grace, and PFD involve the internal affairs of a corporation and should be resolved in accordance with the law of the state of incorporation. Thus, Tennessee law applies to Settlors' breach of fiduciary duties claims under the internal affairs doctrine.

115. Under Tennessee law, Grace owed duties of loyalty, candor, and good faith to its Preferred Shareholders.

116. Under Tennessee law, Directors, as directors and officers of Grace, owed fiduciary duties to Settlors.

117. PFD, as a majority or controlling shareholder of Grace, owed fiduciary duties to Settlors.[13]

118. Grace breached its duties of loyalty, candor, and good faith by intentionally miscounting the number of Preferred Shareholders in order to avoid SEC disclosure requirements. As a result, Grace failed to disclose the Material Omissions to Settlors and other Preferred Shareholders. In particular, Grace failed to disclose the nature and terms of the Keepwell Agreement to the Preferred Shareholders and failed to call upon the Keepwell Agreement to pay Preferred Shareholders dividends or their full Liquidation Preference. In so

[13] Unlike many companies, Grace gave voting control to its preferred stockholders, not its common equity.

doing, Grace was able to enter into transactions that benefited its GS Affiliates at the detriment of its Preferred Shareholders.

119. Directors breached their duty of loyalty, candor and good faith by failing to disclose the impending ARC Transaction to its preferred shareholders, including Settlors, by miscounting the number of Preferred Shareholders in order to avoid SEC disclosure regulations, and by failing to act unselfishly towards Grace and its Preferred Shareholders by causing Grace to enter into self-dealing transactions with GS Affiliates, including Directors' employer – RMD, whereby Directors imparted their insider knowledge of the ARC Transaction to GS Affiliates. The Directors further breached such duties by failing to disclose the nature and terms of the Keepwell Agreement to the Preferred Shareholders and from failing to use the Keepwell Agreement to pay Preferred Shareholders their dividends or Liquidation Preference. These actions were not in the best interests of Grace or its Preferred Shareholders, but instead, were in the best interests of RMD, who employ the Directors, and other GS Affiliates.

120. PFD breached its duty of good faith by failing to disclose the ARC Transaction to Settlors prior to entering the PFD Agreements and by exerting control over Settlors, who were minority shareholders in Grace. Specifically, PFD exerted control over Settlors by issuing a disguised tender offer based on non-disclosed material, inside information about Grace, including Grace's impending plan to liquidate its assets.

121. The foregoing Defendants' breaches of their fiduciary duties to Settlors proximately caused Settlors to be injured.

122. But for the foregoing Defendants' omissions, Settlors would not have entered the PFD Agreements and would have then been entitled to receive either: (1) $26/share as members

of the Holder Class in the Tennessee Lawsuit settlement; or (2) approximately $40/share as a Liquidation Preference following the completion of the ARC Transaction.

**COUNT 6 – ALTER EGO**
**(Grace and PFD)**

123. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

124. At all relevant times hereto, Grace, by and through its Directors, dominated and controlled all aspects of PFD's business, causing PFD to have no separate existence and to act as merely an instrumentality for Grace. Grace also held itself out as being indistinguishable from PFD during negotiations with Settlors leading up to the entry of the PFD Agreements.

125. Grace used its domination and control to cause PFD to acquire a majority of Grace's outstanding Preferred Shares, in connection with the tender offer as set forth in this Complaint. Specifically, Grace caused PFD to purchase Settlors' Preferred Shares by entering into the PFD Agreements for the benefit of Grace and to the detriment of Settlors. Grace and its Directors dominated and controlled all aspects of the tender offer and all communications, agreements, documentation, negotiations, transfers, and other aspects of the PFD Agreements. By acquiring a majority of the Preferred Shares, Grace, via its shell holding company and alter ego PFD, was able to ensure its continued control of Grace's board of directors and control over the Preferred Stock.

126. The control and domination is illustrated by numerous facts including, without limitation:

a. PFD is a shell company that was formed by GS Affiliates. Its managing members are W2007 Finance Sub, LLC and Whitehall Parallel Global Real Estate, L.P. 2007, which also happen to own 100% of the common stock in Grace and 100% of Grace I;

b. PFD does not have any individual members.

c. PFD was formed on July 10, 2012, which was just prior to its first acquisition of Preferred Stock.

d. PFD's only transactions involved the purchase of Grace's Preferred Stock;

e. at all times during the negotiations to purchase Settlors' Preferred Shares, Settlors believed they were negotiating with Grace;

f. negotiations with Settlors were exclusively conducted by Giannoble and Fay who are both directors or officers of Grace;

g. PFD was only introduced to Settlors as an affiliate buyer at the end of negotiations;

h. PFD was only represented by Giannoble and Fay (and Goldman's counsel) in the negotiations.

127. While exercising domination and control of PFD, Grace failed to make the Material Omissions to Settlors prior to Settlors' entry into PFD Agreements, thereby, fraudulently inducing Settlors into the PFD Agreements.

128. In light of Grace's pervasive domination and control of PFD in connection with the fraudulent acts and omissions, the theoretically separate corporate status of PFD should be disregarded, and Grace should be held legally responsible for the acts of PFD. This fact is further supported by the fact that PFD is allegedly waiving any right to recovery in the Tennessee Lawsuit.

129. As a direct and proximate result of the foregoing, Settlors are entitled to a judgment in its favor and against Grace, finding that Grace was the alter ego of PFD, and that as a result, Grace is liable to Settlors for the obligations of PFD, plus pre-judgment interest thereon at the applicable rate, post-judgment interest, reasonable attorneys' fees, and costs.

## COUNT 7 – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY UNDER TENNESSEE LAW
## (RMD)

130. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

131. For the same reasons discussed in Count 3 above, Tennessee law applies to Settlors' Aiding and Abetting claims under the internal affairs doctrine.

132. RMD knew that the Directors, as officers or directors of Grace, owed fiduciary duties to the Settlors.

133. RMD knew that Directors failed to disclose the ARC Transaction and miscounted the number of Preferred Shareholders to avoid the SEC disclosure and filing requirements since the Directors were also officers of RMD. RMD knew these acts or omissions were breaches of Directors' fiduciary duties to Settlors and other Preferred Shareholders.

134. RMD substantially assisted or encouraged the Directors in their acts. In fact, RMD substantially benefitted from Directors' breaches by receiving tens of millions of dollars from Grace under the asset management agreements. These asset management agreements were nothing more than disguised dividends to equity, which were part of a calculated effort to circumvent the restrictions in Grace's By Laws that prevent dividends to equity until preferred dividends are paid.

135. As a result of the Directors' breaches of their fiduciary duties and RMD's substantial assistance in same, Settlors were damaged.

## COUNT 8 – VIOLATION OF TENNESSEE SECURITIES ACT
## (PFD)

136. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

137. The Tennessee Securities Act applies to PFD's purchase of Settlors' Preferred Shares in Grace, because the Preferred Shares sold to PFD are securities issued by a Tennessee corporation and fall within the meaning of the Tennessee Securities Act. PFD was the buyer of these securities.

138. As set forth above in paragraphs 104 through 109, PFD purchased Settlors' securities in violation of T.C.A. § 48-1-121(a) by: (i) employing a device, scheme, or artifice to defraud Settlors; (ii) failing to make the Material Omissions; and (iii) engaging in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

139. Settlors did not know and in the exercise of reasonable care could not have known of PFD's foregoing violations.

**COUNT 9 – VIOLATION OF TEXAS SECURITIES ACT**
**(Directors and PFD)**

140. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

141. Substantial negotiations between Settlors and PFD leading up to the entry of the PFD Agreements occurred in Texas. PFD's principal office is located in Irving, Texas. During the negotiations in question, each of the Directors worked for RMD, which maintained its principal place of business in Irving, Texas. The Directors were responsible for negotiating the sale of the Preferred Shares to PFD and did so from their offices located in Irving, Texas. The Preferred Shares sold to PFD are securities within the meaning of the Texas Securities Act. PFD was the buyer of the securities.

142. PFD purchased all of Settlors' Preferred Shares in Grace.

143. PFD and the Directors have violated Section 33(b) of the Texas Securities Act, TEX. REV. CIV. STAT. art. 581-33(b), (2007), by purchasing the Settlors' Preferred Shares by means of failing to make the Material Omissions as detailed in paragraphs 104 through 109 above.

144. Further, based on article 581-33(D)(7) of the TEXAS REVISED CIVIL STATUTES, Settlors are entitled to reasonable attorneys' fees in connection with their claims under the Texas Securities Act.

145. Accordingly, Settlors seek recovery of the reasonable attorneys' fees they have incurred and will incur in pursuing their claims against the Directors and PFD.

**COUNT 10 – VIOLATION OF SEC SECTION 10b AND RULE 10B-5**
**(PFD, Grace, and the Directors)**

146. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

147. Defendant Grace, by and through the Directors, violated § 10(b) of the 1934 Act and Rule 10b-5 in that they carried out a scheme and course of conduct which was intended to and did: (i) deceive Preferred Shareholders regarding the number of shareholders of records, which allowed Grace to avoid making disclosures regarding Grace's business, operations, management, prospects, including information contained in the Material Omissions, and generally, the value of their Preferred Shares; (ii) deprive the Preferred Shareholders of material information, fair market value of, and a market in which to sell their Preferred Shares; (iii) deprive Preferred Shareholders of dividends by siphoning those funds to themselves via millions of dollars of fees and sweetheart lending deals to GS Affiliates; and (iv) cause Settlors to sell their Preferred Shares to GS Affiliates at depressed prices without relevant and material knowledge of the Material Omissions, which were facts necessary to make such transactions. In

furtherance of this unlawful scheme, plan, and course of conduct, Grace, by and through its Directors, each of them, and Grace's alter ego PFD took the actions set forth herein.

148. As set forth in paragraphs 104 through 109 above, Grace, by and through its Directors and PFD, (a) employed devices, schemes, and artifices to defraud; (b) omitted to make the Material Omissions; and (c) engaged in acts, practices, and course of business that operated as a fraud and deceit upon the Preferred Shareholders in an effort to intentionally deprive and deviate funds to themselves, which should have been paid to the Preferred Shareholders as dividends or Liquidation Preference, and intentionally deprive the Preferred Shareholders of a market for their shares to depress the value whereby Grace, via its alter ego PFD, could acquire a majority share of the Preferred Shares at a significantly reduced price and without making the requisite disclosures required of a company with more than 300 shareholders of record. Such acts violate Section 10(b) of the Act and Rule 10b-5 promulgated thereunder. All of the foregoing Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged in Count 10 below.

149. The Directors, PFD, and Grace, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the Material Omissions from Settlors and other Preferred Shareholders, which contained adverse material information about the business, operations, transactions, and future prospects of Grace as specified herein.

150. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, namely, that Grace was actually considered a public company and should have been making public SEC filings containing such material information, and engaged in acts, practices, and a course of conduct as alleged herein in

an effort to deprive the Preferred Shareholders of dividends and a market in which to sell their shares for a reasonable value, which included the withholding or omitting to state material facts necessary in order to make the Material Omissions concerning the self-dealing transactions with GS Affiliates and other information about Grace and its business operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the Settlors.

151. As a result of the failure to disclose the Material Omissions, as set forth above, the Preferred Shareholders were deprived of dividends, which were instead used to pay GS Affiliates what amounts to a disguised dividend, the value of the Preferred Shares was depressed, rendered illiquid, and Settlors were forced to sell their Preferred Shares to the only willing buyer: PFD, Grace's alter ego and an insider with knowledge of the Material Omissions.

152. Settlors have suffered damages in that, in reliance on Grace, PFD, and the Directors' representations and Material Omissions, Settlors entered the PFD Agreements. Settlors would not have sold their Preferred Shares at the prices paid to them, or at all, if they had been aware of the Material Omissions.

153. At the time of the negotiations leading up to the entry of the PFD Agreements, Settlors and other Preferred Shareholders were ignorant of the Material Omissions. Had Settlors and other Preferred Shareholders and investors in the marketplace known of the Material Omissions, which were not disclosed by these Defendants, Settlors would not have sold their Preferred Shares, or if they had, would have only agreed to do so at higher prices.

154. By virtue of the foregoing, Grace, PFD, and the Directors have violated Section 10(b) of the Act, and Rule 10b-5 promulgated thereunder.

155. As a direct and proximate result of the foregoing Defendants' wrongful conduct, Settlors suffered damages in connection with their respective sales of Grace's securities on August 9, 2013. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's sale of securities giving rise to the cause of action.

## COUNT 11 – CONTROLLING PARTY LIABILITY UNDER SEC SECTION 20(a) (Directors)

156. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

157. The Directors acted as controlling persons of Grace and PFD within the meaning of Section 20(a) of the Exchange Act as alleged herein.

158. Each of the Directors' primary liability, and controlling person liability, arises from the following facts: (1) the Directors were directors or officers, and/or members of Grace's board of directors during the time in question or had control thereof (and, as a result, of Grace's alter ego PFD); (2) each of the Directors, by virtue of his responsibilities and activities as a senior director or officer of Grace, was privy to and participated in the creation, development, and reporting (or failure to do so) of Grace's improper shareholder counting practices, financial condition, transactions, and future prospects, which was material, non-public information regarding Grace; (3) each of the Directors, as an officer or director of Grace owed the Preferred Shareholders fiduciary duties; (4) each of the Directors enjoyed significant personal contact and familiarity with the GS Affiliates, and financially benefitted as employees from at least one known GS Affiliate, RMD, and was advised of and had access to internal reports, data, and other information about Grace's finances, operations, and future plans, including Grace's mis-counting and reporting of the number of its shareholders, plans to enter the ARC Transaction, and settlement in the Tennessee Lawsuit, at all relevant times; (5) each of the Directors was aware of

the Material Omissions, which they knew or recklessly disregarded would allow them to force Settlors, and other Preferred Shareholders, to sell back their Preferred Shares at discounted rates; and (6) each of the Directors knew the Preferred Shareholders had no knowledge of the Material Omissions when made.

159. As set forth above, Grace, PFD, and the Directors each violated Section 10(b) and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

160. By virtue of their positions as controlling persons, the Directors are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Settlors suffered damages in connection with their respective sales of Grace's securities on August 9, 2013. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's sale of securities giving rise to the cause of action.

**COUNT 12 – VIOLATION OF SEC SECTION 14D AND RULE 14d-100**
**(PFD and Grace)**

161. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

162. PFD violated § 14D of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(d)(*l*)) and Rule 14d-100 (17 C.F.R. § 240.14d-100) by failing to make the required filings and disclosures therein in connection with its tender offer.

163. Grace violated § 14D-9 of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(d)(*l*)) and Rule 14d-100 (17 C.F.R. § 240.14d-100) by failing to make and file a response to PFD's tender offer via a Schedule 14D-9. Alternatively, since PFD was the alter ego of Grace, the purchase of Settlors' shares was fundamentally made by Grace. Thus, Grace violated § 14D of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(d)(*l*)) and Rule 14d-100 (17

C.F.R. § 240.14d-100) by failing to make and file a Schedule TO and Schedule 13E-3 in connection with a tender offer for a class of its own equity securities.

164. PFD's acquisition of Settlors' Preferred Stock was a disguised tender offer. PFD's solicitation of Grace's preferred shareholders constitutes a tender offer because it was a device employed to gain control of Grace's Preferred Shareholders through the purchase of a substantial portion of Grace's outstanding Preferred Stock. Settlors were located across the country, included individuals, trusts, and entities with varying percentages of shares, but were united by their large holdings of Preferred Stock. Together, Settlors represented a significant 24.3% of the outstanding and issued Preferred Stock at the time PFD acquired the shares.

165. Because of the illiquidity and lack of a market, caused by Defendants' above-described acts of shareholder oppression, Settlors had no choice but to sell their shares to the only willing buyer: Grace, via its later-disclosed alter ego, PFD. The sale was on a "take it or leave it" basis.

166. Based on the September 2012 press release, Settlors were aware that an entity known as "PFD Holdings, LLC" had previously acquired 35% of the Preferred Stock and was seeking to acquire a majority or all of the outstanding Preferred Shares. However, Settlors lacked any additional information as to who PFD was, who it was operated by, what its function was, what it intended to do with the Preferred Shares, etc. Combined with the prior purchase of 35% of Preferred Stock, PFD's acquisition of Settlors' shares increased its holdings to 58.8%, all in less than one year. Settlors were not given sufficient information regarding PFD at the time of the sale.

167. Importantly, Grace was a public company at the time of PFD's offer. PFD was aware of Grace's inaccurate counting procedures and mis-reporting of same to the SEC, which

improperly permitted Grace to avoid making public filings with the SEC, its Preferred Shareholders, and investing public.

168. For these reasons and others, Settlors needed the protection of the 1934 Act in relation to PFD's tender offer of Grace's Preferred Stock.

169. In making this tender offer for Grace's Preferred Stock, PFD failed to make and file a Schedule TO. As a result of PFD's failure to make and file a Schedule TO in connection with its tender offer, the Material Omissions were not made to Settlors, which were facts necessary in order for Settlors to make an informed decision as to whether to enter the PFD Agreements, given the material facts that have now come to light.

**<u>COUNT 13 – VIOLATION OF SEC SECTION 14e AND RULE 14e-3</u>**
**(PFD)**

170. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

171. PFD violated § 14e of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(e)) and Rule 14e-3 (17 C.F.R. § 240.14e-3) through the use of fraud, deception, or manipulation in connection with its tender offer, request, or invitation for tenders, or solicitation of shareholders with regard to such offers, requests or invitations.

172. Specifically, at the time in question, PFD knew of the Material Omissions, which were material, nonpublic information relating to a tender offer of Grace's securities. PFD was aware of and failed to disclose that Grace was a public company and should have been making public filings with the SEC and the impending sale of all of Grace's assets to ARC. Without first disclosing the Material Omissions, PFD purchased the Settlors' preferred shares in Grace.

173. Without first disclosing the Material Omissions, as explained in more detail above, PFD purchased Settlors' Preferred Stock as part of a tender offer or solicitation of Grace's Preferred Shareholders.

174. PFD's failure to disclose the Material Omissions had the effect of causing Settlors to accept PFD's tender offer evidenced by their entry into the PFD Agreements. Settlors have been injured as a result.

**COUNT 14 –VOID LIQUIDATION UNDER TENNESSEE LAW**
**(Grace and Directors)**

175. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

176. Grace and its Directors violated Section 48-23-102 of the Tennessee Code by failing to obtain a majority vote of the Preferred Shareholders prior to entering into the ARC Transaction. The ARC Transaction was a liquidating event because it involved the sale of substantially all of Grace's assets other than in the usual and regular course of Grace's business. As such, the ARC Transaction was controlled by the limitations placed on Grace, as a Tennessee Corporation, under Section 48-23-102 of the Tennessee Code.

177. The completion of the ARC Transaction constituted a liquidation, which failed to comply with Section 48-23-102 of the Tennessee Code and, thus, should be deemed void.

178. Settlors are entitled to dissent from and obtain fair value of the Preferred Shares from the ARC Transaction because of such acts and failures by Grace and its Directors.

**COUNT 15 – SHAREHOLDER SUIT TO DISSOLVE GRACE**
**(Grace and Directors)**

179. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

180. As a Tennessee corporation, Grace and its Directors are governed by the powers granted to it and restrictions placed on it by Tennessee law.

181. Grace and its Directors violated § 48-24-301 of the Tennessee Code by acting in an illegal, oppressive, or fraudulent manner against Preferred Shareholders. Specifically, as set forth above in paragraphs 104 through 109, Grace and its Directors, in connection with PFD's purchase of the Settlors' Preferred Shares in Grace, a Tennessee corporation, directly or indirectly: (i) employed a device, scheme, or artifice to defraud Preferred Shareholders; (ii) failed to make the Material Omissions; and (iii) engaged in an act, practice, or course of business which operated as a fraud or deceit upon Preferred Shareholders, including Settlors.

182. In addition, as a result of the Directors' acts, Grace's corporate assets were misapplied or wasted. Specifically, the Directors caused Grace to pay exorbitant fees via the asset management agreements and Sharing Agreement entered into with GS Affiliates that were unfair to the Preferred Shareholders and not in Grace's best interest. Pursuant to these agreements, funds that should have been used to pay dividends to Preferred Shareholders were diverted to pay GS Affiliates, including Directors' employer RMD, and thus, themselves, thereby misapplying or wasting Grace's funds at the Preferred Shareholders' expense.

183. As a result, Grace has ceased to function, or has become insolvent, or it has become impossible for Grace to attain the objects for which it was formed.

184. Settlors respectfully ask that the Court impound and distribute the corporate assets of Grace.

## X. CONDITIONS PRECEDENT

185. All conditions precedent to recovery for the causes of action asserted herein have occurred or have been waived.

## XI. PRAYER FOR RELIEF

Plaintiffs pray that Defendants be cited to appear herein and answer, and that upon final hearing Settlors have judgment against Defendants as follows:

1. Direct, consequential, disgorgement, and actual damages;
2. Equitable relief, including constructive trusts, rescission, specific performance, restitution, impounding and dispersing of Grace's assets, and profit disgorgement;
3. Exemplary damages, as allowed by law;
4. Reasonable and necessary attorneys' fees;
5. Pre- and post-judgment interest at the highest rate allowed by law;
6. Costs of suit; and
7. Such other and further relief to which Settlors is justly entitled.

## XII. JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: August 7, 2015

**ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**
875 Third Avenue, 9th Floor
New York, NY 10022
Tel: 212-603-6345

By: /s/ Steven B. Eichel
Steven B. Eichel

AND

**GRUBER HURST ELROD JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75201
Telephone: 214-855-6800

By: */s/ Michael J. Lang*
G. Michael Gruber**

Michael J. Lang**
Laura M. Fontaine**
Chelsea L. Hilliard**

***Pro Hac Vice Pending*

**COUNSEL FOR PLAINTIFFS**